### RIKER *v.* ALSOP and others.

*(Circuit Court, S. D. New York.    April 15, 1886.)*

**RAILROADS—BONDS—FORECLOSURE OF MORTGAGE—OHIO AND MISSISSIPPI RAILWAY COMPANY.**

Contract whereby complainant surrendered certain bonds held by him, and accepted in lieu thereof mortgage bonds, known as "Construction Bonds," of the Ohio and Mississippi Railway Company, (eastern division,) construed, and *held,* that he was entitled to priority over the claims of the Ohio and Mississippi Railway Company, as reorganized under the title acquired by a foreclosure of a prior mortgage.

In Equity.

*B. W. Huntington,* for complainant.

*Platt & Bowers,* and *Geo. W. Wingate,* for defendants.

WALLACE, J.    The complainant files this bill to compel the defendants to account as trustees for the value of certain mortgage bonds known as "Construction Bonds," issued by the Ohio & Mississippi Railway Company, (eastern division,) of which he was holder when the defendants transferred to the Ohio & Mississippi Railway Company (as reorganized) the property and franchises of the original company, which they had purchased upon a sale under a foreclosure of a prior mortgage of that company. The theory of the bill is that

when the defendants purchased the property and franchises of the company upon the mortgage foreclosure they were trustees for the complainant, and for other holders of outstanding construction mortgage bonds, and it was their duty to preserve and recognize the lien of the holders of such bonds as paramount to the title acquired upon the purchase; but that in violation of this duty they conveyed the property purchased discharged of the lien of the ·bonds to the Ohio & Mississippi Railway Company, (as reorganized,) and thereby extinguished the prior lien.

It appears by the proofs that in December, 1858, the complainant was the owner of nine bonds, for $1,000 each, part of an issue of $4,242,000, known as "Construction Bonds," created by the railway company and secured by a mortgage upon its property and franchises. The company had created two prior issues of mortgage bonds secured, respectively, by first and second mortgages upon its property, the construction bonds being secured by a third· mortgage. The company was financially embarrassed. It was in default three interest payments on its first mortgage bonds, as well as in the payment of interest upon its second mortgage bonds, its construction bonds, and its income bonds, which were secured. by a fourth mortgage. The defendant Alsop, and six others who were interested as creditors of the railway company or otherwise, issued a circular to the stockholders and creditors of the company, suggesting a plan to reduce its indebtedness and place it upon a more secure financial footing. By this plan the second mortgage bonds of the company which, with principal and unpaid interest, amounted to something over $300,000, were to be retired; the amount of construction bonds, the principal of which was $4,242,000, was to be reduced one-third; the income bonds, comprising an issue of $3,200,000 were to be exchanged for capital stock; and an adjustment was to be made of all other indebtedness, so that the total mortgage debt of the company should be but $5,000,000, and the capital stock of the company should be limited to $7,500,000; making the aggregate liabilities of the company $12,500,000, as against $18,393,000 then existing. By that circular the stockholders and creditors of the company were invited to join in an agreement annexed, dated as of the fifteenth day of December, 1858, in which Alsop and the others offered to act as trustees for all parties who might subscribe, to effect an adjustment between the bondholders, stockholders, creditors, and the railway company, according to the general plan proposed by the circular. This agreement, in substance, provided that the railway company should issue and deliver to the trustees $7,500,000 of capital stock, to be exchanged by them for the outstanding shares, to enable them to retire the whole issue of second mortgage bonds, one-third of the issue of the construction bonds, and the whole issue of income bonds; that the stockholders of the company should surrender their stock to the trustees, and receive in exchange new stock for one-tenth of the

amount thereof, at par; that the holders of construction bonds should deliver one-third of their bonds to the trustees, and receive in lieu thereof shares of the capital stock of the company at par; that the holders of second mortgage bonds should deliver all their bonds to the trustees, and receive in lieu thereof construction bonds at par for two-thirds and capital stock at par for one-third the amount; and that the holders of income bonds should deliver all their bonds, and receive in lieu capital stock at par.

As it was essential to the success of the plan that substantially all the holders of bonds, debts, and stock should unite, the first 12 articles of the agreement were framed upon the theory that all parties in interest should subscribe. Accordingly, it provided that the trustees should hold all the bonds, stock, and debts which might be surrendered to them as a trust fund for the benefit of all the persons contributing to the fund by the surrender of bonds or stock, and should issue to each subscriber to the agreement making such delivery to them a certificate or certificates, which should be evidence of his interest in the fund according to the relative value of the assets delivered by him to the whole amount of the fund. It also provided that the trustees should exchange the bonds, debts, and stock constituting this trust fund with the railway company for new capital stock of the company, and, when this exchange was effected, should apportion the new stock among the certificate holders according to their respective interests; and that the company should retire the bonds and stock which had been delivered to the trustees and by them to it. By the eleventh article of the agreement it was provided that the certificate holders should hold annual meetings or special meetings at the call of the trustees, at which it should be competent for two-thirds of the holders to modify the agreement or any part thereof.

The agreement was also framed to meet the contingency that the consent of all of the creditors or stockholders could not be obtained, or that foreclosure proceedings might be instituted, and contained provisions to protect the interests of all concerned provided the plan contemplated by the first 12 articles of the agreement could not be successfully carried out. These provisions authorized the trustees to borrow money if it should become necessary to do so in order to protect the interests of the parties; declared that moneys raised by the trustees should become a part of the trust fund in their hands; and authorized the trustees to issue certificates for the sums raised which should give the holders an interest in the fund proportioned to the amount their certificates should bear to the whole amount. By the fourteenth and fifteenth articles of the agreement the trustees were empowered, when in their opinion the exigency of a sale of the road and property should be imminent, to make such arrangements with the mortgagor or the owners of the bonds secured by the mortgage as would enable them to protect the interests of the trust, or purchase the road and property; and were directed, in the event of a purchase, to transfer

the road, and any other property belonging to their trust, to the certificate holders, each to be entitled to the proportion borne by his certificate to the whole amount of certificates; and it was further provided that upon such transfer the trust was to be deemed discharged and terminated. The sixteenth article of the agreement provided for the protection of the rights of the parties in the event of a purchase of the property by any subscriber or subscribers to the agreement by permitting every other subscriber to tender to the purchaser such a proportion of the purchase money as would be equal to the relative amount of his certificate to the whole amount of certificates, and, upon making such tender, to participate in the purchase in the ratio that the money paid by him should bear to the whole purchase money. The agreement also contained a provision which permitted any subscriber to contribute his remaining bonds to the trust, and receive in exchange a certificate which should be "equal to the amount of the bonds and the interest due thereon."

The complainant, and many creditors and stockholders of the railway company, subscribed the agreement. The complainant produced his nine bonds to the trustees, surrendered three of them, obtained his certificate, and retained the remaining six. Prior to December 13, 1860, the great body of stockholders had surrendered their stock to the trustees, and a large amount of the second mortgage bonds and construction bonds had been surrendered; but a foreclosure of the second mortgage had been commenced in the interest of certain bondholders secured by that mortgage who had not surrendered their bonds. The foreclosure suit proceeded to a decree, and a sale of the property covered by the mortgage bonds was advertised. The trustees procured the parties in interest in the foreclosure suit to sell to them the greater part of their bonds, and, under this arrangement, all the second mortgage bonds, except some $15,000 in amount, came into the hands of the trustees, and the foreclosure proceedings were suspended; but in 1866 the trustees procured the complainants to readvertise the property for sale under the decree in that suit, and on the ninth day of January, 1867, the entire property and franchises of the corporation were sold under that decree for the sum of $1,000,-000, the trustees becoming the purchasers. Thereupon the formal title to the property and franchises of the corporation was transferred to the trustees. This was done pursuant to a plan for the reorganization of the company, by which a new corporation was to be created, and the property of the old corporation purchased by the trustees under foreclosure was to be conveyed to it. At this time the affairs of the corporation were prosperous. The trustees controlled all its debts except $2,113,000 of the first mortgage bonds, $15,000,-000 of the second mortgage bonds, and $37,402 of construction bonds.

Prior to the commencement of the suit to foreclose the second mortgage, meetings of the certificate holders had been held, which

had been duly called pursuant to the eleventh article of the trust agreement, at which various modifications of the agreement were adopted by the certificate holders. Prior to the purchase by the trustees the holders of construction bonds had surrendered nearly all of their bonds under the provision in the agreement permitting them to do so, so that but a few of these bonds were left outstanding. The complainant did not surrender six of the nine bonds which he originally held. The proposed reorganization of the company, and the purchase by the trustees under the foreclosure of the second mortgage, were sanctioned by the requisite majority of certificate holders, at meetings duly called. The complainant did not personally participate. He had previously sold his certificate, and the holder participated in the acts of the other certificate holders. At the time of the purchase the trustees seemed to have assumed that they owed the complainant no duty respecting the six bonds which he had not surrendered. After the purchase they conveyed the property and franchises of the company to the new corporation, and that corporation and the trustees have ever since refused to recognize the rights of the complainant, but insist that all his equities as a holder of construction bonds were cut off by the sale under the foreclosure of the prior mortgage.

Upon these facts, it must be held that the complainant is entitled to the relief sought by the bill. Nothing contained in the agreement, or growing out of the relations between the trustees and the holders of construction bonds, authorized the trustees to disregard the rights of holders of the bonds who subscribed the agreement to have their bonds to the extent of the two-thirds not surrendered treated as a subsisting lien upon the property of the corporation in any contingency which might arise under the trust. The provisions of the trust agreement are to be interpreted in the light of the situation existing when it was offered for signature, and of the objects in view as announced by the circular to creditors and stockholders to which it was appended, and with which it is to be read. The trustees did not propose to change the *status* then occupied by the creditors and stockholders, except so far as would be effected by retiring the second mortgage bonds, reducing the construction bonds from $4,242,000 to $2,828,000, and extinguishing the junior income mortgage bonds, and the unsecured debts at the expense of the stockholders of the company who were to surrender their shares.

As appears by the statements in the circular, and from the whole scheme of the agreement, the trustees proposed the attempt of readjusting the indebtedness of the company upon the basis of concessions, whereby both creditors and stockholders were to deliver their claims or shares to the trustees for an exchange with the company for such moneys as the company might have applicable to the payment of its debts, and for new capital stock to an amount not exceeding $7,500,000, unless a further reduction of the bonded debt of

the company might authorize it to increase its capital stock. This was the primary object contemplated by the trust agreement, and all the provisions of the agreement concerning the creation of the trust fund, the disposition to be made of it, and the power and duties of the trustees in the premises, are to be treated as subservient to the main plan and purpose which was proposed to be accomplished. The concessions to be made by holders of construction bonds was the surrender by them of one-third of the principal of their bonds, and the acceptance in lieu thereof of an interest in the trust fund which was to come into the hands of the trustees under the plan of the agreement. Beyond the one-third which they were to surrender, they were to have no interest in the trust fund, and their rights were to remain the same as though no agreement had been subscribed; and the only change effected in their previous relations to the company was that thenceforth they were embarked with the trustees in the common undertaking which the trustees obligated themselves to carry out. By the terms of the agreement the trustees promised to distribute the trust fund which was to be created among the certificate holders according to their respective interests. If they had succeeded in exchanging the claims which had been surrendered to them by creditors for stock of the company, the trust fund which they would have distributed would have been the stock of the company, and the certificate holders would have become stockholders whose rights would have been subordinate to the existing mortgages upon the property. The holders of construction bonds who had surrendered a third of their holdings under the agreement would have occupied the position of stockholders for the amount surrendered, but their rights as bondholders for the unsurrendered two-thirds of their bonds would have remained the same as before.

It was not contemplated by the agreement that the trustees should acquire title to the road and franchises of the company, unless it should become necessary to do so in order to avert a sale under a foreclosure for the protection of their *cestuis que trust*. Had this contingency occurred, they would still have maintained the position of trustees towards all those who subscribed the agreement, and their purchase would have been made in the interests of all, and with a view to carry out the general objects which they originally proposed. If that had happened, the road and franchises, as well as the fund already existing in their hands, would have become merged in the general trust fund, which they were to distribute conformably to the scheme of the trust. There is not a word in the agreement to indicate that they could purchase the road discharged of the equitable lien of those who had surrendered a portion of their bonds in order that the remaining part should be more safely secured. The trustees would have bought the road and franchises not discharged of the lien of two-thirds of the construction bonds, which it was one of the purposes of the trust to protect, but in subordination to it; and it would

then have been their duty, when making distribution to the certificate holders under the fifteenth article of the trust, to recognize and protect the rights of construction bondholders who had subscribed the agreement. If they had purchased the road when a foreclosure sale was imminent, the trust fund which would have been in their hands for distribution would have been in equity precisely what it would have been if no foreclosure sale had taken place and no purchase had been made; and the rights of holders of construction bonds who had subscribed the agreement to have their security as to two-thirds remain undisturbed, and the duties of the trustees to preserve their security, would have been exactly the same as if the trustees had succeeded in carrying out the scheme of the first 12 articles of the agreement, and were about to make distribution of the trust fund to certificate holders under the twelfth article.

The trustees did not purchase upon the foreclosure of the second mortgage because a sale of the property was imminent. They did so because a sale, and a purchase by them under such a sale, would afford a convenient method of closing out their trust, and enable them to convey a satisfactory title to the new corporation. Of course they occupy no better position towards the complainant than they would if they had purchased pursuant to the conditions of the trust. They now insist, as they have insisted all along, that they owe no duty to the complainant, and that no one had any right to share in the proceeds of the trust fund arising under the agreement except certificate holders, or in the distribution of the property which they acquired by purchase. It does not follow because the complainant had no interest in the trust fund, and was not entitled to share in its distribution after he had parted with his certificate, that the trustees owed him no duty respecting the unsurrendered two-thirds of his bonds. They undertook to become his trustee for the purpose of protecting, as well as could practically be done, his interest as a secured bondholder of the company, to the extent of two-thirds of his original security, in consideration of his becoming a subscriber to the agreement. If this is not a correct view of the relation they promised to assume towards the construction bondholders, what inducement did the agreement offer to holders of such bonds to join in it? Their mortgage was a prior lien to the income mortgage of $3,200,000. They were to have nothing for relinquishing one-third of their security except an equal share in the trust fund with the income bondholders, and a proportionate share with creditors and stockholders. They were to have but comparatively little participation in the management and control of the fund, because they would be but a minority of the voting power. Obviously, one of the main inducements which led them to sign was the consideration that the trustees, who were to undertake the readjustment of the affairs of the company, should become their trustees, for the protection of their interests as bondholders, in carrying out the details of the scheme.

The sixteenth article of the agreement indicates very conclusively that every subscriber to the agreement, whether bondholder or stockholder, was to be protected in the event of a purchase of the property by any other subscriber, directly or indirectly, which would include a purchase by the trustees. Under this article it would have been the privilege of the complainant to surrender his remaining six bonds under the seventh article of the agreement, and receive a certificate for their amount. Thus, the agreement was carefully devised to protect every subscriber to the full extent of his interest, both as bondholder and certificate holder, in the event that the trustees might be unable to protect him. That contingency did not occur, but the trustees themselves purchased the property. They could acquire no better rights upon such a purchase against the complainant than could have been acquired by any other purchaser who had become a party to the agreement.

There is nothing in the provisions of the agreement conferring upon certificate holders the right, by a majority vote, at general meetings or special meetings called for the purpose, to modify the conditions of the agreement which affect the rights of the complainant as a holder of bonds. It was evidently contemplated by the agreement that those who surrendered their claims to the trustees were, to the extent of claims surrendered, to be placed upon the footing of stockholders of the company. They were ultimately to receive stock in proportion to the amount of their respective surrendered claims. While the readjustment was pending, they were to be permitted to exercise the powers ordinarily exercised by stockholders in directing and controlling the trustees, who, through the stock in their hands, were, in turn, to direct and control the affairs of the corporation. The trustees were therefore, in effect, representing a body of *quasi* stockholders. But neither certificate holders nor trustees were invested with any authority to extinguish or impair the rights of bondholders whose claims against the corporation were paramount to any equities which stockholders could acquire in its property.

The obligations assumed by the trustees towards bondholders in the position of the complainant are not to be found in any of the express provisions of the trust agreement. These provisions are mainly intended to define the powers and duties of the trustees in administering the trust fund which should come to their hands, and the rights and interests of those entitled to participate in it. The duties incumbent upon the trustees in the protection of the complainant grow out of the character of the relations which they assumed towards every person who became a party to the agreement. They undertook to use their best exertions for the financial rehabilitation of the company, without requiring any sacrifice on the part of construction bondholders beyond that of one-third of their holdings. The complainant had a right to reply upon the faithful discharge of that obligation. The trustees were placed, by his consent, in part, in a

position which enabled them to control the financial situation. They did control it; but, after they had acquired control, used the opportunity to subordinate his rights to the interests of the certificate holders. It is by no means certain that the complainant cannot enforce his bonds against the new corporation as an equitable lien upon its property. Whether this is so or not, he can look to the trustees personally by whose acts his lien upon the property of the company was subverted.

The defendant Whitewright did not become a trustee until July 27, 1867, after the purchase by the trustees at the foreclosure sale. One of the original trustees had died, and Whitewright was elected to fill the vacant place in order to join with the other trustees in a conveyance of the property to the new corporation. The eighteenth article of the trust agreement provides that neither of the trustees shall be responsible for the act or omission of any of his associates, or for any act not willfully or grossly negligent. This article merely expresses what a court of equity would hold in the absence of such a provision. *Worrall* v. *Harford*, 8 Ves. 8; *Dawson* v. *Clarke*, 18 Ves. 254; *Clough* v. *Dixon*, 8 Sim. 594; *Peter* v. *Beverly*, 10 Pet. 532; *Latrobe* v. *Tiernan*, 2 Md. Ch. 474. When Whitewright consented to step into the place of a prior trustee, it was his duty, before joining in any disposition of the property of the trust fund, to ascertain whether the act he was about to perform would be prejudicial to any of the *cestuis que trust* whom he represented. The legal lien of the complainant under the construction mortgage upon the mortgaged property was cut off by the sale under the foreclosure of the prior mortgage. His equitable lien remained, however, until the property was conveyed to a purchaser for value, and without notice. Whether the new corporation was such a purchaser may be doubtful; but however this might be, the effect of the conveyance was to introduce new owners, and compel the complainant to follow the property into the hands of strangers, under complications which it is not incumbent upon him to unravel.

A decree is ordered for complainant for the value of his bonds at the time of the conveyance, with interest.